[No. D002433. Fourth Dist., Div. One. Oct. 22, 1986.]

SUSAN EHRHARDT et al., Plaintiffs and Appellants, v. BRUNSWICK, INC., Defendant and Appellant.

**COUNSEL**

Daniel F. Bamberg and Bamberg & James for Plaintiffs and Appellants.

Donald H. Glaser, Richard E. Showen and Higgs, Fletcher & Mack for Defendant and Appellant.

**OPINION**

**WIENER, Acting P. J.**—This appeal in a product liability action arises out of a tragic boating accident in which plaintiff Susan Ehrhardt, a novice water skier, lost her leg. The jury agreed with plaintiffs that the boat was equipped with a defective throttle/shift control system which caused Susan's injuries and awarded her damages of $1.5 million and her husband Ross $300,000 as against defendant Brunswick, Inc. and its Mercury Marine Division, manufacturer of the boat's MerCruiser Power Package which

included the shift system. Brunswick now argues that the jury's verdict is not supported by substantial evidence because of a factual impossibility in the plaintiffs' theory as to how the accident occurred. Brunswick also contends the trial court erred in excluding certain demonstrative evidence tending to show an alternative manner in which the accident might have occurred. We disagree on both points and affirm the judgment. We reject, however, plaintiffs' claim that the appeal is frivolous.

Cross-appealing, plaintiffs assert the court erred in failing to submit the issue of punitive damages to the jury. We decide the evidence of malice and recklessness on Brunswick's part was insufficient to warrant a jury finding on that issue. Accordingly, we also affirm that portion of the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1969, Dale and Nancy Kostman purchased a 19-foot Thunderbird boat with a 160-horsepower MerCruiser engine. In 1976, William O'Connor bought a one-half interest in the Kostmans' boat.

On the type of boat purchased by the Kostmans, a single handle operates as both a shifter and throttle control. When the handle is pushed forward from a center or "neutral" position, the boat is in forward gear. The farther the handle is pushed, the faster the boat goes. Pulling back on the handle from the "neutral" position places the boat in reverse gear. Again, the farther back the handle is pulled, the faster the boat goes but in the opposite direction. Shortly after they purchased the boat, the Kostmans began experiencing shifting difficulties which continued to require repair and/or adjustment throughout the life of the boat.

The circumstances surrounding the accident were presented to the jury through the testimony of four eyewitnesses: Susan and Ross Ehrhardt, Dale Kostman and William O'Connor. About noon on the day of the accident, Susan was waterskiing when she fell while crossing the boat's wake. Using a standard procedure, O'Connor, who was driving the boat, circled around Susan allowing the tow rope to trail behind the boat so that Susan could reach it. As the boat slowed, Kostman took the throttle from O'Connor and performed a "backdown" procedure which involved momentarily putting the shift control into a reverse position, reversing the engine in order to arrest the boat's forward momentum. Kostman then returned the shift handle to the neutral position and began conversing with Susan about her skiing while O'Connor resumed the controls. At the time the boat came to a complete stop, it was approximately 30 to 35 feet from Susan. Kostman's conversation with her lasted anywhere from one to three minutes. As he talked with Susan, Kostman saw that the boat was moving toward her. When

the boat was approximately 15 feet from Susan, Kostman became concerned and said something to the effect, "We're getting pretty close. . . . Let's go." In response, O'Connor "pushed the [shift] lever arm forward assertively. I pushed it fast forward." Instead of going forward, however, the boat jumped backward over Susan, severing her leg.

Two experts testified for the plaintiffs. Ron Doss, a forensic engineer, inspected the boat shortly after the accident. He found that the boat's throttle/shift control system had failed. The shift control handle mounted near the driver's position in the boat was connected to the outdrive at the rear of the boat by two cables. A "shift control cable" caused the engine to shift gears from forward to reverse. The "throttle control cable" regulated the speed of the engine. Doss testified that the outer sheath of the shift control cable was corroded and deteriorated. By contrast, the throttle control cable showed no signs of unusual wear. As a result, when the control handle was moved from reverse through neutral to the fast forward position, the throttle operated correctly (open-to-idle-to-open) but the gears stuck in reverse. Doss demonstrated how this malfunction would result in a situation where the boat would jump backwards over Susan Ehrhardt even though William O'Connor had placed the control handle in a fast-forward position. He explained that the corrosion of the shift control cable likely was caused when a protective polyethylene jacket around the cable was perforated, perhaps by several sharp screws which protruded near the cable. This allowed saltwater to come in direct contact with the cable and in turn caused the corrosion.

Doctor Phil Charley, a mechanical engineer with a doctorate in chemistry, explained why in his opinion the design of the shift control cable was defective. He attributed the cable's failure to a design which forced an outer conduit assembly to move over a stationary inner wire rather than vice-versa. This system placed compressive forces on the outer conduit assembly which it was not designed to handle. As a result, the "control cable failed because the outer sheath stress-cracked and permitted moisture to enter the cable; and the wires inside, being made out of steel, were unable to withstand the corrosive effect and disintegrated; and since the cable itself was configured in a situation so that it had to take a compressive load, when it was called upon to take a compressive load the wires birdcaged and were unable to do that . . . ."[1]

---

[1]The defect identified by Dr. Charley was addressed by Brunswick in a 1982 redesign of the MerCruiser Power Package which resulted in both ends of the shift control cable being anchored such that the outer conduit assembly bore none of the compressive load. Brunswick argued that the redesign was accomplished for reasons unrelated to plaintiffs' allegations of a design defect.

DEFENDANT'S APPEAL

I

Under the plaintiffs' theory of the case as described by expert witnesses Doss and Charley, when Dale Kostman performed the "backdown" procedure and returned the control handle to the "neutral" position, the throttle cable performed properly and reduced the engine speed to an idle. The shift cable malfunctioned, however, and never disengaged the gears from "reverse." Thus, while Kostman conversed with Susan Ehrhardt about her skiing, plaintiffs' experts theorized that the boat slowly backed up toward Susan while idling in reverse gear.

Focussing on this portion of plaintiffs' theory, Brunswick directed one of its engineers to perform tests to determine how far a boat similar to the Kostman's would travel in "idle reverse" over a two-minute period. Charles Mapes testified that the test boat traveled backward at a rate of 3.24 feet per second in "idle reverse." Based on these figures, Brunswick argues that plaintiffs' theory of the case is a factual impossibility because the boat would have traveled backwards more than 350 feet during the time Kostman spoke with Susan rather than the 15-20 feet testified to by the 4 eyewitnesses. ■ ■■■ Accordingly it argues that the factual impossibility demonstrates that the jury verdict is not supported by substantial evidence. (See *Bennett* v. *Chandler* (1942) 52 Cal.App.2d 255, 261-262 [126 P.2d 173].)[2]

In contrast to Brunswick, we are not surprised that the jury heard Mapes's testimony but nonetheless ruled in favor of plaintiffs. At best, the evidence suggests that the eyewitnesses' estimates of time and distance may have been mistaken. The witnesses themselves admitted as much.[3] Also, as the plaintiffs point out, Mapes made certain assumptions in his tests which

---

[2]The *Bennett* court makes clear that this "factual impossibility" exception to the usual rule of appellate deference to the trier of fact must be cautiously invoked: "When circumstances show that the story told by a litigant and his witnesses cannot by any possibility be true, or when their testimony is inherently impossible, the appellate court will not hesitate to reverse the judgment to the end that the cause may again be submitted to the determination of a jury or trial judge. On the other hand, it is the duty of an appellate court to exercise great care in applying the tests of common sense and common knowledge of physical laws to a given set of facts. Experience and observation teach that strange things sometimes happen in the world of physical phenomena and accidents sometimes appear to happen in a manner unaccountable. For these reasons an appellate court must be careful not to give to dogmatic and undemonstrated conclusions respecting natural laws precedence over the testimony of apparently credible witnesses; and the mere fact that the admitted circumstances make the story of the witnesses seem improbable will not justify a reversal by an appellate tribunal on the ground that the verdict is contrary to the evidence." (*Id.* at p. 262.)

[3]Consider the testimony of Dale Kostman: "You know, I don't honestly recall how much time I spent talking to Sue. It may have been a very short conversation or, you know,—I'm sorry, I really don't recall the time. It was not a long period of time."

arguably differed from the circumstances of the accident.[4] Finally, Mapes's testimony does not contradict the essence of plaintiffs' case: that the boat jumped backward rather than going forward due to a defect in the throttle/shift control mechanism.

■ Plaintiffs' case was well supported by eyewitness testimony and expert opinion. Brunswick's evidence in the form of Mapes's "idle reverse" tests may cast some doubt on the perceptions of the witnesses concerning the details of a necessarily traumatic occurrence; it does not undermine the substantial evidentiary support for the jury's verdict.

## II

In addition to his "idle reverse" test, Charles Mapes also made a videotape demonstration of how a water skier could be pulled into a boat's propeller if the skier was holding onto a tow rope which became wrapped around the propeller. Relying in part on testimony by Dale Kostman that he had to unwrap the tow rope from the propeller after Susan was rescued, Brunswick sought to introduce the Mapes videotape to demonstrate a possible alternative cause of the accident. The court ruled the evidence inadmissible.

Plaintiffs objected to the admission of the Mapes's videotape because it was inconsistent with the testimony of all four eyewitnesses who stated that the boat backed over Susan rather than Susan being pulled into the boat. We presume it was on this basis that the court refused to admit the evidence.
■ "It is the settled rule that evidence of the results of experiments as to a disputed fact is not admissible unless the conditions of the experiment are substantially identical to those out of which the dispute arises." (*Andrews* v. *Barker Brothers Corp.* (1968) 267 Cal.App.2d 530, 537 [73 Cal.Rptr. 284].) Here, the theory of the demonstration tape directly contradicted the consistent eyewitness testimony that the boat jumped backward when the control handle was pushed to a "fast forward" position. Moreover, the tape assumes that the tow rope became wrapped around the propeller before the accident and that Susan Ehrhardt either was holding onto or became entangled in the rope. The record provides no support for either of these assumptions.[5]

---

[4] For instance, the test boat used by Mapes had a 17-pitch propeller. Brunswick recognizes that the accident boat may have had a 15-pitch propeller in which case Mapes's calculations would have been 11 percent too high. Also, the "idle reverse" speed calculation was made by Mapes after the boat reached a constant reverse speed. The eyewitnesses' testimony is not totally specific as to when their time estimates began but at best the boat began at a complete stop and was not "up to speed."

[5] Brunswick relies heavily on the fact that the tow rope was wound around the propeller after the accident. It could not demonstrate, however, that this is not a likely result when a boat is backed up over a floating tow rope.

A court has considerable discretion when, after viewing all the evidence at trial, it is asked to determine whether the circumstances of a proffered experiment or demonstration are "substantially identical" to the circumstances presented by the evidence. (*Garcia* v. *Hoffman* (1963) 212 Cal.App.2d 530, 535 [28 Cal.Rptr. 98]; *Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 522 [109 Cal.Rptr. 110].) The trial judge here acted well within the bounds of his discretion in excluding Brunswick's demonstration tape.

PLAINTIFFS' APPEAL

Plaintiffs challenge the court's refusal to instruct the jury on punitive damages. ■ Punitive damages may be awarded in a product liability action if it is shown that the defendant placed a product on the market in conscious disregard of the safety of consumers and others. (See *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 808 [174 Cal.Rptr. 348].) "[T]he plaintiff must establish that the defendant was aware of the probable dangerous consequences of its conduct and that it wilfully and deliberately failed to avoid those consequences." (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 395 [196 Cal.Rptr. 117], italics omitted.)

Plaintiffs presented certain evidence which superficially appears to indicate Brunswick was aware that aspects of its shift/throttle control system could malfunction in a manner consistent with plaintiffs' theory of how it malfunctioned in this case. For instance, the service manual for the engine includes a shift system troubleshooting chart which describes one problem with the system as, "Shift Handle Moves; Unit Does Not Shift." But as a regional service manager for Mercury Marine explained, the long shift cable alleged by plaintiffs to be the cause of the accident is not even listed by the chart as one of the potential causes of such a malfunction. Also, a 1973 "interplant memo" recounted testing performed on shift cables manufactured by companies other than Brunswick, noting that the cables had significantly deteriorated after 10 to 11 months of exposure time. Referencing one shift cable in particular, the memo commented, "It appears that this cable was ready to fail when we removed it from the boat." The evidence also established, however, that Brunswick was unaware of any claimed failures in the 2 million control cables it manufactured since 1962 other than the one involved in this case.

More importantly, plaintiffs' proffered evidence fails to demonstrate that Brunswick had any idea that its shift system was malfunctioning as the result of a *design defect* in the shift system. Plaintiffs' theory was not that a design defect in the shift system in and of itself caused the accident. Rather, they argued that Brunswick did not design a "failsafe" shift system

which took into account the possible negligence of boat manufacturers in installing sharp screws which could perforate the shift cable's polyethylene covering. (See *ante,* p. 738.) The evidence indicates that Brunswick failed to anticipate a possible failure of the shift cable, erroneously relying on a lack of past problems in assuming that the protected location of the cable made deterioration, corrosion and ultimate failure nearly impossible. Perhaps Brunswick *should have* foreseen that if a cable failed, the design of the shift system might result in a boat jumping backwards when the throttle/shift control was placed in a fast forward position. But punitive damages are not awardable merely because the defendant acted unreasonably. The punitive damage standard established by Civil Code section 3294 requires that the defendant have *actual knowledge* of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm. Here, there is minimal evidence regarding Brunswick's awareness of problems associated with its shift system and no indication Brunswick ever anticipated that any such problems could cause a boat to back up when the control handle was pushed forward. Moreover, there is no evidence that Brunswick knew that any shift-related problems of which it was aware were caused by its design of the shift control system and that it thereafter refused to redesign the system to eliminate the problems. Under these circumstances, the trial court did not err in refusing to submit the issue of punitive damages to the jury.

DISPOSITION

Judgment affirmed.

Work, J., and Benke, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.