Filed 7/26/18 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY et al., | C085308 |
| Petitioners, | (Super. Ct. No. JCCP4853) |
| v. | ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY, | |
| Respondent; | [NO CHANGE IN JUDGMENT] |
| RICHARD ABI-HABIB et al., | |
| Real Parties in Interest. | |

THE COURT:

Real parties in interest have filed a petition for rehearing with this court. It is ordered that the published opinion filed herein on July 2, 2018, be modified as follows:

1. At page 5 of the slip opinion, in the first full paragraph beginning with "At the hearing on the motion for summary adjudication," add the word "clearly" so the first sentence reads as follows:

1

At the hearing on the motion for summary adjudication, plaintiffs argued clearly for the first time that punitive damages are appropriate because (1) PG&E has a nondelegable duty to operate its power lines safely, (2) PG&E sought to delegate responsibility for this duty to independent contractors, and (3) PG&E failed to ensure that contractors hired employees who were qualified and properly trained, such that (4) PG&E's conduct demonstrates conscious disregard of the safety of others, whether or not PG&E was aware of its contractors' alleged deficiencies.

There is no change in the judgment. Real parties in interest's petition for rehearing is denied.

BY THE COURT:

/S/

_____

MAURO, Acting P. J.

/S/

_____

MURRAY, J.

/S/

_____

RENNER, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY et al., | C085308 |
| Petitioners, | (Super. Ct. No. JCCP4853) |
| v. | |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY, | |
| Respondent; | |
| RICHARD ABI-HABIB et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING in mandate.  Petition Granted.  Allen H. Sumner, Judge.

Quinn, Emanuel, Urquhart & Sullivan, Kathleen M. Sullivan, Robert Feldman and Daniel H. Bromberg for Petitioners.

No appearance for Respondent.

Dreyer, Babich, Buccola, Wood, Campora, Steven M. Campora, Robert A. Buccola, Catia G. Saravia; Corey, Luzaich, de Ghetaldi, Nastari & Riddle, Dario de

1

Ghetaldi, Amanda L. Riddle; Cotchett, Pitre & McCarthy and Frank M. Pitre for Real Parties in Interest.

This coordinated proceeding arises out of the Butte Fire, a devastating wildfire that swept through Calaveras and Amador counties in September 2015. The fire started when a tree came into contact with an overhead power line owned and operated by petitioners Pacific Gas and Electric Company and PG&E Corporation (together, PG&E or the company). Real parties in interest (plaintiffs) brought suit against PG&E, seeking punitive damages under Public Utilities Code section 2106 and Civil Code section 3294.[1] PG&E sought summary adjudication of plaintiffs' request for punitive damages under section 3294 only. The trial court denied the motion.

PG&E seeks writ relief from the trial court's order. We conclude there are no triable issues of fact which, if resolved in plaintiffs' favor, could subject PG&E to punitive damages under section 3294.[2] Accordingly, we grant the petition.

## I.  BACKGROUND

*A.     The Butte Fire*

The Butte Fire started on September 9, 2015, near Butte Mountain Road in Jackson, California.[3] The fire spread rapidly through drought-stricken Amador and Calaveras counties. By the time the blaze was contained some three weeks later, the fire had consumed more than 70,868 acres, damaging hundreds of structures and claiming two lives. It is undisputed that the fire started when a gray pine (the subject tree) came into contact with one of PG&E's power lines.

---

[1] Undesignated statutory references are to the Civil Code.

[2] We express no opinion as to PG&E's potential liability for punitive damages under Public Utilities Code section 2106.

[3] The Butte Fire was named for its point of origin near Butte Mountain Road.

2

*B.     The Litigation*

More than 2,050 plaintiffs brought suit against PG&E and others.  Plaintiffs' complaints were consolidated in a Judicial Council Coordinated Proceeding in Sacramento Superior Court.  A master complaint was filed on behalf of plaintiffs (many of whom have been named as real parties in interest) who suffered personal injuries and losses to real and personal property as a result of the fire.  The master complaint names PG&E, ACRT, Inc. (ACRT) and Trees, Inc. as defendants.  According to the master complaint, ACRT and Trees, Inc. (together, contractors) provided vegetation management services to PG&E as independent contractors.

The master complaint alleges that PG&E and the contractors failed to properly maintain the power line and adjacent vegetation.  According to the master complaint, the events leading to the Butte Fire were set into motion when two trees were removed from a stand near the power line, leaving the subject tree exposed and unsupported.  The master complaint alleges that the removal of the two trees left the subject tree open and leaning to the south, towards the path of the sun and the nearby power line.  The subject tree is alleged to have been approximately 44 feet tall and seven inches in diameter.  Under the circumstances, the master complaint avers, it was foreseeable that the subject tree would fail and come into contact with the power line, producing sparks that could— and tragically, did—ignite a wildfire.

The master complaint asserts causes of action against PG&E for negligence, wrongful death and survival, inverse condemnation, public nuisance, private nuisance, premises liability, trespass, violation of Public Utilities Code section 2106 and violation of Health and Safety Code section 13007.  The master complaint seeks punitive damages from PG&E under Public Utilities Code section 2106 and section 3294.

*C.     The Motion for Summary Adjudication*

PG&E moved for summary adjudication of the request for punitive damages under section 3924, arguing that plaintiffs could not raise a triable issue of material fact to

3

support the request under any theory. In support of the motion, PG&E presented evidence that contractors' employees visited the area near the subject tree several times over the course of the year preceding the fire, but did not identify the subject tree as a danger or report any compliance issue to PG&E. PG&E also presented evidence that the company has expended substantial resources to establish vegetation management programs intended to prevent or minimize the risk of wildfire. According to PG&E, the existence of such programs affirmatively disproves any inference that PG&E acted with conscious disregard for the safety of others, thereby negating a necessary element of plaintiffs' claim for punitive damages.

Plaintiffs opposed the motion, arguing that contractors' employees are unqualified and improperly trained, and PG&E's vegetation management programs are superficial and ineffective. According to plaintiffs, these programs are little more than window dressing, designed to create the appearance of an effective risk management program and attention to public safety. In support of their opposition, plaintiffs submitted evidence that PG&E's risk and compliance committee merely assumed that the company's risk mitigation measures were functioning as intended, but failed to take steps to ensure that this was the case. Plaintiffs also submitted evidence that PG&E failed to ensure that contractors' employees were qualified and properly trained to identify vulnerable trees, such as the subject tree. According to plaintiffs, the evidence established that "the Butte Fire was the result of PG&E's years of continued, conscious disregard for ensuring the proper functioning of risk management controls that [PG&E] knew were essential to safeguard the public and their property from the risk of wildfire."

In anticipation of the hearing, the trial court issued a lengthy tentative ruling granting the motion for summary adjudication. The tentative ruling found that, "in most instances, plaintiffs fail to contend much less offer evidence supporting, any connection between the alleged failings in PG&E's [vegetation management] programs and the Butte Fire." The tentative ruling further found that, "much of the evidence plaintiffs cite as

4

failings in PG&E's management of its power lines does not support a finding that PG&E acted with 'malice'—that it was aware of the dangerous consequences of its conduct and deliberately failed to avoid those consequences." Accordingly, the trial court tentatively found that plaintiffs' evidence was insufficient as a matter of law to raise a triable issue of fact as to their entitlement to punitive damages.

At the hearing on the motion for summary adjudication, plaintiffs argued for the first time that punitive damages are appropriate because (1) PG&E has a nondelegable duty to operate its power lines safely, (2) PG&E sought to delegate responsibility for this duty to independent contractors, and (3) PG&E failed to ensure that contractors hired employees who were qualified and properly trained, such that (4) PG&E's conduct demonstrates conscious disregard of the safety of others, whether or not PG&E was aware of its contractors' alleged deficiencies. Relying on *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115 (*Romo I*), cert. granted and judgment vacated by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028, plaintiffs' counsel argued that California law does not permit PG&E to "shield itself" from punitive damages liability by delegating responsibility for safeguarding the public against the risk of wildfire to independent contractors. (*Romo I, supra,* at p. 1140.)

After the hearing, the trial court invited the parties to submit supplemental briefs addressing plaintiffs' newly articulated theory. Following further briefing, the trial court changed its tentative ruling and denied the motion for summary adjudication. The trial court explained, "PG&E was aware of the risk and the need for those inspecting or removing trees to be qualified. Its contracts required ACRT and Trees[, Inc.] to use qualified personnel. Plaintiffs offer evidence the inspectors were in fact not qualified, and this resulted in their failure to identify the danger posed by the Subject Tree. Plaintiffs, however, offer no evidence PG&E was on notice of this." The trial court asked, "Does the fact PG&E deferred to its contractors to assure their employees were qualified amount to clear and convincing proof (1) PG&E was aware of the probable

5

dangerous consequences of its conduct, and (2) deliberately failed to avoid those consequences?" The trial court concluded, "The court is not prepared to hold no reasonable jury could so find." Accordingly, the trial court denied PG&E's motion for summary adjudication.

## D.     *The Petition for Writ of Mandate*

PG&E filed a petition for writ of mandate, prohibition, or other relief, challenging the trial court's denial of summary adjudication as to the request for punitive damages. We reviewed PG&E's petition and supporting papers and issued an order to show cause.[4]

## II.  DISCUSSION

PG&E contends the trial court erred in denying the motion for summary adjudication of plaintiffs' request for punitive damages under section 3294. We agree.

## A.     *Standard of Review*

"An order denying a motion for summary adjudication may be reviewed by way of a petition for writ of mandate. [Citation.] Where the trial court's denial of a motion for summary judgment will result in trial on non-actionable claims, a writ of mandate will issue. [Citations.] Likewise, a writ of mandate may issue to prevent trial of nonactionable claims after the erroneous denial of a motion for summary adjudication. [¶] Since a motion for summary judgment or summary adjudication 'involves pure matters of law,' we review a ruling on the motion de novo to determine whether the moving and opposing papers show a triable issue of material fact. [Citations.] Thus, the appellate court need not defer to the trial court's decision. ' "We are not bound by the

---

[4] PG&E also filed a "motion for stay of trial, calendar preference, and expedited hearing date" with this court. PG&E subsequently filed an unopposed motion to withdraw the portion of the earlier motion seeking a stay of the trial. PG&E's unopposed motion to withdraw is granted. PG&E's motion for calendar preference and expedited hearing are granted.

trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." ' [Citations.]" (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450, fn. omitted.)

"A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo." (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.) A party is entitled to summary judgment or summary adjudication "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "In deciding whether a material factual issue exists for trial, we 'consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence.' [Citation.]" (*Duarte v. Pacific Specialty Insurance Company* (2017) 13 Cal.App.5th 45, 52.) We view the evidence in the light most favorable to the nonmoving party. (*Ibid.*)

A defendant "moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A defendant's initial burden in moving for summary judgment is to come forward with evidence to make a prima facie showing that there is no triable issue of material fact (*ibid.*), where the material facts are determined by the pleadings. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320.) If the defendant meets that burden of production, the burden shifts to the plaintiff to make a showing that there is a triable issue of material fact. (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* at p. 850.)

7

*B.      Standard of Proof*

Punitive damages may be recovered under section 3294 "where it is proven by *clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice." (§ 3294, subd. (a), italics added.) In reviewing a summary judgment or summary adjudication ruling on a claim for punitive damages, we view the evidence presented through the prism of the substantive clear and convincing evidentiary burden. (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1048 (*American Airlines*); see also *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1121 ["on a motion for summary adjudication with respect to a punitive damages claim, the higher evidentiary standard applies. If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence"]. )

Under the clear and convincing standard, the evidence must be " ' " 'so clear as to leave no substantial doubt' " ' " and " ' " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.) Although the clear and convincing evidentiary standard is a stringent one, "it does not impose on a plaintiff the obligation to 'prove' a case for punitive damages at summary judgment [or summary adjudication]." (*American Airlines, supra,* 96 Cal.App.4th at p. 1049; see also *Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 761.) Even so, "where the plaintiff's ultimate burden of proof will be by clear and convincing evidence, the higher standard of proof must be taken into account in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the higher evidentiary standard." (*American Airlines, supra,* at p. 1049.) Likewise, in reviewing the trial court's denial of PG&E's motion for summary adjudication, "we view the evidence with the higher burden of proof in mind." (*Johnson & Johnson, supra*, at p. 762.) Summary judgment or

summary adjudication " ' "on the issue of punitive damages is proper" only "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." ' " (*Ibid.*)

C.      *Section 3294*

As noted, section 3294 permits an award of punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (§ 3294, subd. (a).)  Plaintiffs contend PG&E acted with malice.

Malice is defined by section 3294, subdivision (c)(1) as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  "Despicable conduct" is conduct that is " 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by most ordinary decent people.' " (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 330.)  Such conduct has been described as having the character of outrage frequently associated with crime.  (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287.)  "Conscious disregard" means " 'that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences.' " (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 61.)  Put another way, the defendant must "have *actual knowledge* of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm." (*Ehrhardt v. Brunsick, Inc.* (1986) 186 Cal.App.3d 734, 742.)

Section 3294's malice requirement has evolved over time.  As another panel of this court explained in *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1210-1211 (*Lackner*):  "The definition of malice has not always included the requirement of willful and despicable conduct.  Prior to 1980, section 3294 did not define malice.  It was construed to mean malice in fact, which could be proven directly or by implication

9

[citations] and could be established by conduct that was done only with 'a conscious disregard of the safety of others.' "

Our Supreme Court addressed the then existing malice requirement in *Taylor v. Superior Court* (1979) 24 Cal.3d 890 (*Taylor*). In that case, the court affirmed that a conscious disregard for the rights or safety of others may constitute malice within the meaning of section 3294, but clarified that, "In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences." (*Taylor, supra,* at pp. 895-896.) The *Taylor* court also acknowledged, with apparent approval, this court's conclusion in *G.D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22, 32 that mere reckless disregard or misconduct cannot be enough to sustain an award of punitive damages because, " 'The central spirit of the exemplary damage statute, the demand for evil motive, is violated by an award founded upon recklessness alone.' " (*Taylor, supra,* at p. 895, quoting *G.D. Searle & Co. v. Superior Court, supra,* at p. 32.)

The Legislature amended section 3294 in 1980. (*Lackner, supra,* 135 Cal.App.4th at p. 1211; Stats. 1980, ch. 1242, § 1, pp. 4217-4218.) Among other things, the Legislature added subdivision (b), which "limited the circumstances under which an employer could be held liable for punitive damages 'based upon acts of an employee.' " (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 712-713 (*College Hospital*), quoting § 3294, subd. (b); see also *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 ["The drafters' goals [in amending section 3294 to add subdivision (b)] were to avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages"]. ) The Legislature also defined the terms "oppression," "fraud," and "malice," adopting the definition of malice set forth in *Taylor.* (§ 3294, subd. (c); *Lackner, supra,* at p. 1211.)

The Legislature revisited section 3294 in 1987. (*College Hospital, supra,* 8 Cal.4th at p. 713; Stats. 1987, ch. 1498, §§ 1-7, pp. 5777-5782.) As relevant here, the Legislature increased the plaintiffs' burden of proving punitive damages to "clear and convincing evidence." (*College Hospital, supra,* at p. 713.) As previously discussed, the statute now " 'requires a finding of high probability . . . " 'so clear as to leave no substantial doubt,' [and] 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Lackner, supra,* 135 Cal.App.4th at p. 1211.) The Legislature also refined the definition of "malice" by adding the terms "despicable" and "willful." (Stats. 1987, ch. 1498, § 5, p. 5780; *Lackner, supra,* at p. 1211 ["As amended, malice, based upon a conscious disregard of the plaintiff's rights, requires proof that the defendant's conduct is 'despicable' and 'willful' "].)

Our Supreme Court considered the effect of the 1987 amendments in *College Hospital,* noting: "By adding the word 'willful' to the 'conscious-disregard' prong of malice, the Legislature has arguably conformed the literal words of the statute to existing case law formulations. (See [*Taylor*]*, supra,* 24 Cal.3d 890, 895-896 [malice involves awareness of dangerous consequences and a willful and deliberate failure to avoid them].) However, the statute's reference to 'despicable' conduct seems to represent a new substantive limitation on punitive damage awards. Used in its ordinary sense, the adjective 'despicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.' (4 Oxford English Dict. (2d ed. 1989) p. 529.) As amended to include this word, the statute plainly indicates that absent an intent to injure the plaintiff, 'malice' requires more than a 'willful and conscious' disregard of the plaintiffs' interests. The additional component of 'despicable conduct' must be found." (*College Hospital, supra,* 8 Cal.4th at p. 725.)

"Because punitive damages are imposed 'for the sake of example and by way of punishing the defendant' (§ 3294, subd. (a)), they are typically awarded for intentional torts such as assault and battery, false imprisonment, intentional infliction of emotional

11

distress, defamation, nuisance intentionally maintained, fraud, trespass, conversion, civil rights violations, insurer's breach of covenant of good faith, wrongful termination and job discrimination, and products liability cases." (*Lackner, supra,* 135 Cal.App.4th at p. 1212.) By contrast, "cases involving unintentional torts are far fewer and the courts have had to consider various factors in determining whether the defendant's conduct was despicable. Thus, punitive damage awards have been reversed where the defendant's conduct was merely in bad faith and overzealous [citations], or the defendant took action to protect or minimize the injury to the plaintiff." (*Ibid.*) We have found no case considering an award of punitive damages in circumstances similar to those presented here.

D.    *Analysis*

In reviewing a summary adjudication, "we apply the same three-step analysis required of the trial court: We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836.)

1.    *The Master Complaint*

The master complaint alleges that PG&E contracted with contractors to provide vegetation management services in Amador and Calaveras counties. According to the master complaint, "Those services include, but are not limited to, assessing, monitoring, inspecting, trimming, cutting, maintaining, managing, and/or replacing vegetation surrounding and in close proximity to the lines and facilities operated by PG&E to [e]nsure that those power lines operate safely and consistently with State and Federal regulations." The master complaint describes ACRT as "an Ohio corporation doing business all over the United States as a utility vegetation management consulting and

12

training company." The master complaint describes Trees, Inc. as "a Delaware corporation doing business all over the United States as a utility vegetation management company."

The master complaint alleges that "defendants" inspected a stand of gray pines near the power line in October 2014. Two trees from the exterior of the stand were targeted for removal. The two trees were removed in January 2015, leaving the subject tree exposed and leaning towards the power line. According to the master complaint, "It is commonly known that when a stand is altered and interior trees previously captured are then exposed to open spaces, they are prone to failure. It is also well understood that trees have a physical orientation toward the path of the sun and this can have significant consequences for maintaining safety." Within less than a year, the subject tree made contact with the power line and ignited the Butte Fire.

The master complaint alleges that "defendants" failed "to properly train and to supervise employees and agents responsible for maintenance and inspection of the distribution lines and/or vegetation areas near those lines." The master complaint further alleges that PG&E has a pattern and practice of disregarding public safety, as demonstrated by other fires attributed to PG&E's power lines, various regulatory actions against PG&E by the California Public Utilities Commission, and the rupture of a PG&E gas line in San Bruno in September 2010. According to the master complaint, "The deaths, injuries, and damage occasioned by the Butte Fire are the result of the ongoing policies, practices, and/or financial decisions made by [PG&E] [which has] acted with a conscious disregard for public safety, and created a corporate culture that places a priority for profits above safety in their business operations."

The master complaint seeks punitive damages from PG&E on the grounds that it "acted willfully, wantonly, with . . . malice, and/or with a knowing, conscious disregard for the rights and or safety of others." The master complaint avers that punitive damages

13

are appropriate "for the sake of example" and seeks an award "sufficient to punish . . . PG&E . . . for [its] despicable conduct."

    2.    *PG&E's Showing*

In seeking summary adjudication, PG&E submitted evidence that the company devotes significant resources to vegetation management programs, which are intended to minimize the risk of wildfire. According to PG&E, the company spends more than $190 million per year on vegetation management operations, which target a roughly 70,000 square mile service area, with nearly 135,000 miles of overhead power lines.

PG&E's vegetation management operations encompass a variety of programs and initiatives, including routine annual patrols, quality assurance and quality control programs, a vegetation management improvement initiative, a vegetation management catastrophic event memorandum account (CEMA) program, and a public safety and reliability program. We discuss the routine annual patrol program momentarily, in the context of PG&E's fire mitigation activities in the area near the subject tree. (See Section II.D.2.b, *infra.*) We briefly describe PG&E's other vegetation management programs below.

    a.    *Vegetation Management Programs*

PG&E established the quality assurance department in 2000. The quality assurance department conducts twice yearly audits to determine whether the company's vegetation management programs are functioning as intended. As relevant here, the audits sample areas along the power lines to ensure that trees comply with applicable regulations and PG&E's internal standards.

PG&E established a separate quality control program in 2002. The quality control program evaluates PG&E's contractors for compliance with applicable regulations and PG&E's internal standards.

PG&E implemented the vegetation management improvement initiative in 2006. The vegetation management improvement initiative offers independent contractors

14

incentives to work more efficiently, for example, by encouraging them to remove trees that would otherwise require continuous annual maintenance.

PG&E established the public safety and reliability program as part of the vegetation management improvement initiative. The public safety and reliability program was created to identify trees with the highest risk of failure in order to prevent them from coming into contact with power lines. As part of the public safety and reliability program, the company maintains a tree failure database which identifies trees with the highest potential to fail and locations where such failure-prone trees are most likely to come into contact with power lines.

PG&E established the CEMA program in 2014 in response to a state of emergency due to severe drought conditions. The CEMA program encompasses several initiatives intended to mitigate the risk of fire from drought affected trees. As part of the CEMA program, the company conducts aerial patrols in selected areas during fire season, searching for trees showing signs of defect, decay or decline. If such trees are found, ground patrols are dispatched to the area to inspect the trees and mitigate any issues.

As part of the CEMA program, the company uses another independent contractor, Quantum Spatial, to collect data using Light Detection and Ranging (LiDAR) and hyperspectral imaging. Quantum Spatial analyzes and interprets the data, which can be used to assess the relative health of a tree. If Quantum Spatial determines that a tree tall enough to strike the power lines is dead, dying or non-compliant, this information is passed along to an independent inspection company, such as ACRT, which is then required to visit the tree and mitigate the issue.

b.      *Routine Annual Patrols:  ACRT and Trees, Inc.*

PG&E estimates that approximately 55 million trees have the potential to come into contact with its power lines. As noted, PG&E addresses this risk, in part, by

15

conducting routine annual patrols of all such trees.[5]  PG&E contracts with inspection companies to assess potentially non-compliant trees and prescribe any work that needs to be done, such as trimming or removal.  PG&E contracts with tree-trimming companies to perform the work prescribed by the inspectors.  As noted, ACRT was PG&E's inspection company in Amador County, where the fire originated, and Trees, Inc. was PG&E's tree-trimming company.

PG&E's contract with ACRT provides that, "Contractor shall diligently perform all [w]ork in a proper and professional manner in accordance with the requirements of all applicable federal, state, and/or local laws, rules, ordinances, and regulations, in accordance with the approved principles of modern Arboriculture, and to the satisfaction of PG&E."  PG&E's contract with Trees, Inc. similarly provides that, "Contractor shall diligently perform all [w]ork in a proper, appropriate and professional manner, in accordance with [a]ll [a]pplicable [r]equirements [defined to include applicable law, industry standards, and PG&E's vegetation management standards] and approved principles of modern Arboriculture."

PG&E's contracts also require that contractors hire personnel with specified qualifications, depending on their duties.  For example, a consulting utility forester with ACRT is required to have "at least two years' experience in line clearance tree pruning work or equivalent experience as determined by the PG&E Representative."  An associate's degree in forestry, arboriculture, or a related field is desired, but not required. PG&E's contracts also require that ACRT and Trees, Inc. train their employees on vegetation management programs and practices.

---

[5]  As we shall discuss, the routine patrol cycle was extended to fifteen months in 2013. (See Section II.D.3.a, *infra.*)

     *c.     Vegetation Management Activities in the Area Near the Subject Tree*

Joy Mellera was a consulting utility forester with ACRT.  Mellera conducted a routine patrol of the area near the subject tree on October 17, 2014.  She recommended that two trees be removed, recording her recommendations on an electronic work request.  Trees, Inc. removed the two trees on January 6, 2015, recording the activity on another electronic form.  Both forms were transmitted to PG&E.  Neither form indicates that the subject tree presented any danger or had the potential to grow or fall into the power line before the next annual patrol.[6]

Contractors performed an additional inspection and other work in the area near the subject tree in April and July 2015.  Contractors generated electronic forms documenting these efforts, some of which were considered by the trial court in ruling on the motion.  None of the forms contain any indication that the subject tree presented a danger.

PG&E also presented evidence that Quantum Spatial collected hyperspectral imaging and LiDAR data in the area near the gray pine during the summer of 2015.  Although the data was not delivered to PG&E until after the Butte Fire, the subject tree was not identified by Quantum Spatial as dead, dying, or non-compliant.

     *3.     Plaintiffs' Showing*

In opposing summary adjudication, plaintiffs submitted evidence that PG&E views wildfire as the single greatest threat to the company's business, and the gray pine as the species of tree posing the greatest risk of wildfire.  According to plaintiffs, PG&E demonstrated conscious disregard for the rights and safety of others by failing to ensure

---

[6] Plaintiffs' objected to the trial court's consideration of the forms, arguing they were inadmissible hearsay.  The trial court overruled some of plaintiffs' objections and sustained others.  The trial court considered the form deemed inadmissible as hearsay for the limited purpose of determining whether the form gave notice to PG&E that the subject tree posed a danger.  As we shall discuss, plaintiffs fail to show that the trial court abused its discretion in ruling on any evidentiary objection.  (See Section II.D.5, *infra.*)

the proper functioning of risk management controls and fire mitigation measures designed to protect the public from the known risk of wildfire.

Plaintiffs submitted evidence that PG&E's risk management controls were flawed in numerous respects. Among other things, plaintiffs argued that PG&E's risk and compliance committee was ineffective, its quality assurance and quality control audits unreliable, and its instructions to contractors inconsistent with the goal of mitigating fire risk. Plaintiffs also submitted evidence that PG&E made no changes to its risk management controls and fire mitigation measures as a result of the Butte Fire. Of greatest significance, plaintiffs submitted evidence that PG&E failed to ensure that ACRT's employees were properly trained. We discuss the evidence that PG&E failed to train or ensure the training of ACRT's employees momentarily (see Section II.D.3.b, *infra*), pausing first to consider plaintiffs' other challenges to PG&E's risk management controls and fire mitigation measures.

a.      *Flawed Risk Management Controls and Fire Mitigation Measures*

In opposing summary adjudication, plaintiffs submitted evidence that PG&E's risk and compliance committee did not directly verify that company's fire mitigation measures were functioning as intended. Instead, the committee expected that each of the departments responsible for implementing the measures would evaluate their efficacy and report to the committee. According to plaintiffs, the committee's bureaucratic structure, which delegates responsibility for managing wildfire risk to individual departments within PG&E, demonstrates conscious disregard for the rights and safety of others, stemming "from the highest levels of PG&E."

Plaintiffs also submitted evidence that PG&E extended the routine patrol cycle to fifteen months in 2013, resulting in more non-compliant and hazardous trees in the area near the subject tree. However, it was undisputed that PG&E returned to an annual patrol cycle in 2014, and inspected the gray pine in October 2014.

18

Plaintiffs also submitted evidence that PG&E instructed ACRT to hire people lacking the minimum education and experience specified in its contract.[7]  However, the undisputed evidence established that these people were seasonal CEMA inspectors, whose primary responsibility was to search for drought-affected trees.  There was no showing that the subject tree was a drought-affected tree.

Plaintiffs also submitted expert opinion evidence that the audits performed by the quality assurance department and quality control program were scientifically unreliable.  According to plaintiffs' expert, PG&E "confused the sampling units between their design and implementation," "used an incorrect formula for sample size planning," and "failed to calculate the actual margin of error of their estimates after samples were selected, only reporting estimated percentages."  Additionally, the expert opined, "PG&E failed to exploit key information about the location of risk from year to year in improving their sampling methods" and "ignored estimation of the total number of trees in a district that posed fire risks due to (potential) facility contact thereby creating a false sense of whether the level of tree/line potential contact was acceptable."  There was, however, no showing that PG&E's audit methodology contributed to the Butte Fire.

Plaintiffs also argued that PG&E's vegetation management improvement initiative created perverse incentives for contractors to *refrain* from identifying or working on potentially hazardous trees.[8]  However, there was no showing that the vegetation management initiative contributed to the Butte Fire.

---

[7] In response, PG&E explained that PG&E and ACRT decided to recruit CEMA inspectors from a larger applicant pool when ACRT was unable to find inspectors meeting the criteria specified in the contract.

[8]  PG&E responds that the initiative sought to reduce the routine patrol workload by working selected trees more efficiently, not by refraining from doing the work at all.  For example, a tree that might otherwise require annual or bi-annual pruning could be

Plaintiffs also argued that PG&E's use of LiDAR to search for dead, dying or non-compliant trees was ineffective because the company did not receive Quantum Spatial's analysis of the data until after the fire season was over. However, there was no showing that the subject tree was identified as dead, dying or non-compliant.

### b. Failure to Train or Ensure Training

In opposing the motion for summary adjudication, plaintiffs argued that PG&E understood that properly trained personnel were essential to controlling the risk of wildfire, but demonstrated conscious disregard for the rights and safety of others by failing to confirm that contractors "trained their own employees on the risks presented by the gray pine, specifically in the foothills." (Emphasis omitted.) Specifically, plaintiffs submitted evidence that PG&E does not train contractors on managing vegetation near power lines, and does not ensure that contractors provide appropriate training to their employees.

Plaintiffs also submitted evidence that Mellera was not trained to recognize the danger posed by the subject tree. Of greatest significance, Mellera was not trained to identify trees that might become unstable due to the ratio between height and diameter, and was not trained to evaluate whether removing trees from the edge of a stand would be likely to affect interior, adjacent trees. According to plaintiffs' expert witness, certified arborist Kenneth Menzer, "A properly trained and educated inspector, properly evaluating the subject tree, should have marked the tree for removal."

removed, thereby eliminating the need to work the same tree year after year. Alternatively, contractors could clear a larger distance between trees and power lines, thereby reducing the need for future work.

### 4. *PG&E Met Its Initial Burden*

Based on our independent review, we conclude that PG&E has carried its initial burden of showing the nonexistence of any triable issue of material fact on the issue of malice. PG&E presented evidence that (1) the company devotes substantial resources to vegetation management programs intended to mitigate the risk of wildfire, (2) the company hired contractors to conduct routine patrols in the area near the subject tree, and (3) contractors' employees visited the area near the subject tree on several occasions, and did not report anything that should have put PG&E on notice that the subject tree posed a danger. PG&E's evidence negates any inference that the company acted despicably, and with willful and conscious disregard for the rights and safety of others, and was sufficient to shift the burden to plaintiffs to present admissible evidence creating a triable issue of material fact as to malice.

Plaintiffs challenge PG&E's prima facie showing, arguing the trial court should have sustained their numerous objections to PG&E's supporting evidence. Specifically, plaintiffs argue the trial court should have sustained their objections to the declarations of April Kennedy, Stephen Tankersley, Eric Woodyard and Niel Fischer.[9] According to plaintiffs, the foregoing declarations "were largely incompetent, lacking foundation because they contained statements not within the personal knowledge of the declarants, but rather derived from documents that they may or may not have reviewed and which they could not authenticate, or because PG&E's counsel provided them with the

---

[9] Kennedy is a supervising program manager in the company's vegetation management program, overseeing the Central Valley region, which includes Jackson, California. Prior to his retirement in 2015, Tankersley was the senior manager of vegetation management operations. Woodyard is a program manager for vegetation management, overseeing technology and innovation. Fischer is a supervising program manager for vegetation management. In 2015, Fischer was a principal program manager for vegetation management, overseeing the CEMA program.

21

information." As support for their argument, the substance of which is set forth in full above, plaintiffs direct our attention to their complete set of evidentiary objections, which spans more than 50 pages, and the transcript of the hearing on the motion for summary adjudication. Plaintiffs do not discuss their specific objections to specific declarations, and do not elaborate on their reasons for believing the trial court erred.

" 'Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. [Citations.]' [Citation.] The party challenging a trial court's evidentiary ruling has the 'burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason. [Citation.] "Where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the correct result for the decision of the trial court." [Citation.] We will only interfere with the lower court's judgment if appellant can show that under the evidence offered, " 'no judge could reasonably have made the order that he did.' " ' [Citation.]" (*Duarte v. Pacific Specialty Insurance Company, supra,* 13 Cal.App.5th at p. 52, fn. omitted.)

Plaintiffs have failed to show any abuse of discretion. As PG&E observes, each of the challenged declarations was made by a present or former PG&E manager with personal knowledge of one or more aspects of the company's vegetation management programs. Each of the declarants averred under penalty of perjury that the facts stated in their declarations were true and correct, based on their personal knowledge of PG&E's operations and their review of records used in the course of their employment. The trial

court was entitled to accept these assertions of personal knowledge.**10** (Cf. *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484.)

Each of the declarants also averred that the documents attached to their respective declarations were true and correct copies of records maintained by PG&E in the ordinary course of its business. The trial court could reasonably conclude that the documents attached to the challenged declarations were sufficiently authenticated and admissible as business records. (See *People ex rel. Owen v. Media One Direct, LLC, supra,* 213 Cal.App.4th at p. 1484 [authentication adequate where declarant averred that she reviewed files relating to the matter and attached documents were true and correct copies of pertinent correspondence]; and see *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322 ["The witness need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed"].)

Plaintiffs have failed to show that the trial court abused its discretion in overruling and/or impliedly overruling their objections to PG&E's supporting evidence. We therefore reject plaintiffs' challenge to the trial court's evidentiary rulings, and conclude that PG&E carried its initial burden of showing the nonexistence of any triable issue of material fact on the issue of malice. (*Aguilar, supra,* 25 Cal.4th at p. 850.)

---

**10** Plaintiffs argue without citation to the record that "PG&E's witnesses admitted in deposition that they did not have personal knowledge of many of the 'facts' they stated in their declarations." "We have no duty to search the record for evidence and may disregard any factual contention not supported by proper citations to the record." (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 928; see Cal. Rules of Court, rule 8.204(a)(1)(C); *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149 ["we will not scour the record on our own in search of supporting evidence"].)

23

5.      *Plaintiffs Failed to Raise a Triable Issue of Material Fact*

Having concluded that PG&E carried its initial burden, we next consider whether plaintiffs presented sufficient evidence to raise a triable issue of fact as to malice.  Based on our independent review, we conclude they did not.

" ' "Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy.  The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . .  Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." ' " (*American Airlines, supra,* 96 Cal.App.4th at p. 1051; see also *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1288, fn. 14 [" '[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness.  Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing' "].)

Even viewing the evidence as favorably to plaintiffs as we can, plaintiffs fail to demonstrate the existence of a triable issue of material fact with respect to malice.  Plaintiffs argue that PG&E evinces a cavalier attitude towards public safety, which justifies an award of punitive damages.  They point to numerous potential shortcomings in PG&E's risk management controls and fire mitigation efforts, raising thought-provoking questions about the efficacy of the risk and compliance committee's reporting structure, the wisdom of the decision to extend the routine patrol cycle in 2013 and loosen hiring standards for seasonal CEMA inspectors, the soundness of the company's audit methodologies and incentives for reducing patrol workload, and the timeliness of Quantum Spatial's delivery of LiDAR data.  But these criticisms, whatever their merits, do not amount to clear and convincing proof that PG&E acted with malice.  At most,

24

plaintiffs' evidence shows " ' "mere carelessness or ignorance," ' " which is insufficient to establish malice. (*American Airlines, supra,* 96 Cal.App.4th at p. 1051.) We therefore conclude, as the trial court did, that no reasonable jury could find plaintiffs' challenges to PG&E's risk management controls and fire mitigation efforts to be clear and convincing proof of malice.

Arguing by analogy to *Romo I*, plaintiffs maintain that the problems with PG&E's risk management controls and fire mitigation measures were symptoms of a larger problem: a corporate culture that prioritizes profits over safety. According to plaintiffs, the company as a whole acted despicably, and with willful and conscious disregard for the rights and safety of others, by deciding, as a matter of corporate policy, to abdicate responsibility for ensuring the efficacy of PG&E's risk management controls and fire mitigation measures to others. The trial court found plaintiffs' analogy to *Romo I* to be persuasive. We do not.

*Romo I* arose out of a car accident that resulted in the deaths of three members of the Romo family. (*Romo I, supra,* 99 Cal.App.4th at p. 1124.) During the accident, the family car, a 1978 Ford Bronco, rolled over several times. As the car rolled, a steel portion of the roof collapsed, killing the car's driver. A fiberglass portion of the roof broke loose, striking and killing two passengers. Three remaining passengers survived with injuries. (*Ibid.*)

The surviving family members sued Ford on products liability and negligence theories, seeking compensatory and punitive damages. (*Romo I, supra,* 99 Cal.App.4th at p. 1124.) Following a four-month trial, the jury returned a verdict of approximately $6 million in compensatory damages and $290 million in punitive damages.[11] (*Id.* at p.

---

[11] The Court of Appeal for the Fifth Appellate District subsequently struck down the punitive damages verdict on remand after the U.S. Supreme Court's opinion in *State Farm Mut. Ins. v. Campbell* (2003) 538 U.S. 408 in *Romo v. Ford Motor Co.* (2003) 113

25

1125.)  The trial court then reduced the compensatory damages to approximately $5 million based on comparative fault and granted a motion for a new trial on the issue of punitive damages.  (*Ibid.*)  Both sides appealed.  (*Ibid.*)

On appeal, Ford argued that the plaintiffs failed to present sufficient evidence of malicious or despicable conduct.  (*Romo I, supra,* 99 Cal.App.4th at p. 1139.)  Specifically, Ford argued that the plaintiffs failed to present clear and convincing proof that " 'at least one particular Ford employee, officer, director or managing agent had the requisite malicious state of mind in 1978.' "  (*Ibid.*)  The court rejected Ford's argument, characterizing it as a "fundamental misconception of the required proof."  (*Ibid.*)  The court then offered an overview of the "managing agent" requirement found in section 3294, subdivision (b), noting:  "In most of the cases in which the 'managing agent' issue has resulted in reversal of a punitive damage award, initial liability arises from a particular tortious act of an employee of the corporation.  [Citations.]  Defendant has cited no case, and our own research has failed to disclose any case, in which a series of corporate actions and decisions, such as the design, production, and marketing of an automobile, has been found inadequate to support an award of punitive damages on the basis that the multitude of employees involved in various aspects of the process were not high enough in the corporate chain of command.  When the entire organization is involved in the acts that constitute malice, there is no danger a blameless corporation will be punished for bad acts over which it had no control, the primary goal of the 'managing agent' requirement.  [Citation.]"  (*Romo I, supra,* at p. 1140.)

The court continued, "There is no requirement that the evidence establish that a particular committee or officer of the corporation acted on a particular date with 'malice.'  A corporate defendant cannot shield itself from liability through layers of management

<hr>

Cal.App.4th 738, 763 (*Romo II*).  The *Romo II* court issued remittitur reducing the award to $23.7 million, or five times the total compensatory damages figure.  (*Ibid.*)

26

committees and the sheer size of the management structure. It is enough if the evidence permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.' [Citation.]" (*Romo I, supra,* 99 Cal.App.4th at pp. 1140-1141.)

The court also rejected Ford's argument that the plaintiffs failed to " 'present evidence of any "malicious or despicable" conduct with respect to the design and production of the 1978 Bronco,' " stating: "This ignores the fact that the design and production of the vehicle was the despicable conduct: we think it obvious that putting on the market a motor vehicle with a known propensity to roll over and, while giving the vehicle the appearance of sturdiness, consciously deciding not to provide adequate crush protection to properly belted passengers (in the words of a corporate memo introduced in evidence, 'penalizing' passengers for wearing a seatbelt) constitutes despicable conduct. Such conduct could kill people. The question is not whether the conduct, if it occurred, was despicable, the question is whether there is sufficient evidence from which a rational trier of fact could find that the knowing conduct occurred." (*Romo I, supra,* 99 Cal.App.4th at p. 1141.)

Applying these standards, the court found that the plaintiffs presented substantial evidence permitting an inference that Ford willfully and consciously ignored the dangers inherent in its Bronco design, resulting in the deaths of three persons. (*Romo I, supra,* 99 Cal.App.4th at p. 1141.) Among other things, the court found that the plaintiffs presented clear and convincing evidence that Ford's policymakers ignored the company's own internal safety standards, created a false appearance of the presence of an integral roll-bar, and declined to test the strength of the roof before placing the car in production. (*Id.* at p. 1148.) On this record, the court found that there was substantial evidence permitting a reasonable trier of fact to conclude that Ford's decision to put an unreinforced fiberglass roof on the 1978 Bronco was despicable. (*Id.* at pp. 1144-1145.)

27

Relying on *Romo I*, plaintiffs argue that they need not show that any particular managing agent acted with malice, because the company as a whole consciously and willfully adopted risk management controls and fire mitigation measures which, like the design and production of the 1978 Bronco, were themselves despicable. We have no quarrel with the notion that an inference of corporate malice can be based on the existence of a company policy that willfully, consciously, and despicably disregards the rights and safety of others. (*Romo I*, *supra,* 99 Cal.App.4th at pp. 1144 [substantial evidence supported an inference of corporate malice where policymakers decided to disregard safety standards to bring product to market]; see also *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923 [substantial evidence supported an inference of corporate malice where insurer's denial of coverage was "part of a conscious course of conduct, firmly grounded in established company policy"].) We likewise accept the premise that corporate malice can be shown, in the case of a large corporation, "by piecing together knowledge and acts of the corporation's multitude of managing agents." (*Romo I*, *supra,* at p. 1141.) But plaintiffs would have us go one step further and hold that a company policy that fails to protect against a known risk of harm necessarily raises an inference of corporate malice, since the existence of the policy establishes the company's state of mind with respect to the risk. Put another way, plaintiffs would have us conclude that an unsuccessful risk management policy necessarily reflects a conscious and willful company decision to ignore or disregard the risk. This we decline to do.

That PG&E adopted policies that failed to prevent the Butte Fire does not, without more, raise a triable issue as to malice. Although plaintiffs need not produce a "smoking gun," they must nevertheless present evidence that "permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.' " (*Romo I, supra,* 99 Cal.App.4th at p. 1141.) Plaintiffs have failed to present any such evidence.

28

*Romo I* illustrates the point.  There, the plaintiffs offered evidence that Ford's decision-makers disregarded the determination of the company's own safety engineers that unreinforced fiberglass should never be used for components comprising the passenger compartment, and no utility vehicle should be produced without a roll bar. (*Romo I, supra,* 99 Cal.App.4th at pp. 1144-1145.)  The plaintiffs also offered evidence to support an inference that Ford's decision-makers disregarded safety policies dictating that crush resistance should have been higher, and declined to conduct pre-production testing.  (*Ibid.*)  Here, by contrast, there was no evidence, let alone clear and convincing evidence, that the company consciously compromised standards that might have prevented harm to plaintiffs or willfully declined to conduct risk assessments that could have revealed weaknesses in the company's approach to a known risk. (*Romo I, supra,* at pp. 1144-1145 [describing evidence that policymakers disregarded recommendations of safety engineers and opted to forego routine testing in order to bring the product to market more quickly].)  Although plaintiffs dismiss the company's risk management controls and fire mitigation efforts as a mere "façade," they fail to produce clear and convincing evidence from which a reasonable jury could find that PG&E consciously disregarded the risk of wildfire or willfully ignored fire safety standards.

Nor could a reasonable jury find that plaintiffs presented clear and convincing evidence that PG&E acted maliciously in hiring contractors or delegating training responsibility to them.  Plaintiffs do not discuss this theory in their return.  Nevertheless, no evidence suggests that ACRT or Trees, Inc. were manifestly unfit or unqualified.  Nor does the evidence suggest that PG&E engaged in low bidding or other pricing behavior that might cast doubt on the bona fides of the company's contractual arrangements with contractors.  Nor does the evidence suggest that PG&E was aware of facts that should have put the company on notice that contractors were not fulfilling their contractual obligation to properly train employees.  Although there is potentially evidence from which a reasonable jury could infer that PG&E should have devised better methods for

29

ensuring that contractors' employees were properly trained, such evidence, at most, supports a theory that PG&E acted carelessly or negligently, not despicably, with conscious and willful disregard for the rights and safety of others. (*Taylor, supra,* 24 Cal.3d at p. 894-895 [" 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton*' "].)

We acknowledge that there may be circumstances in which a company policy of outsourcing essential corporate duties to independent contractors could contribute to an inference of malice. But we cannot agree with the trial court that PG&E's unstated policy or practice of deferring to contractors to properly train their own employees could lead a reasonable jury to find by clear and convincing evidence that PG&E acted with malice. As we have suggested, nothing in the record supports an inference that PG&E willfully or consciously disregarded the need for contractors to use properly trained employees. To the contrary, PG&E required that contractors hire qualified employees, train their employees on vegetation management programs and practices, and "diligently perform all [w]ork in a proper and professional manner . . . in accordance with the approved principles of modern Arboriculture." No reasonable jury could find by clear and convincing evidence that PG&E acted with malice in failing to ensure that contractors complied with these requirements. Contrary to plaintiffs' previously articulated theory, on this record there was nothing despicable in PG&E's assumption that contractors were training their employees as required.

PG&E's nondelegable duty to maintain the power lines in a safe condition does not convince us otherwise. "The nondelegable duties doctrine prevents a party that owes a duty to others from evading responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work. The doctrine applies when the

30

duty preexists and does not arise from the contract with the independent contractor." (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal4th 590, 600-601.)  As relevant here, the nondelegable duty rule means that PG&E may be vicariously liable for compensatory damages arising from contractors' negligence, irrespective of fault. (*Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 727 ["the nondelegable duty rule is a form of vicarious liability because it is not based on the personal fault of the landowner who hired the independent contractor.  Rather, the party charged with a nondelegable duty is '*held liable for the negligence of his agent*, whether his agent was an employee or an independent contractor' "]; see also *Snyder v. Southern California Edison Co.* (1955) 44 Cal.2d 793, 798 and 801 [public utilities owe nondelegable duties to the public, but their liability " 'extends only to negligence in the failing to take the necessary precautions, failing to adopt a reasonably safe method, or in failing to produce a result which it is the duty of the employer-contractee to have attained' "].)  No authority suggests that the existence of a nondelegable duty alters the analysis under section 3924, and we decline to so hold.

Plaintiffs suggest other bases for affirming the trial court's order, including PG&E's involvement in another wildfire in 1994 (the "Rough and Ready Fire") and the San Bruno pipeline explosion.  As the trial court recognized, a jury may consider PG&E's entire course of conduct in assessing its culpability.  (See generally *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1206, fn. 6 ["By placing the defendant's conduct on one occasion into the context of a business practice or policy, an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature"].) However, "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.  A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." (*State Farm Mut. Ins. v. Campbell, supra,* 538 U.S. at p. 422; see also

31

*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 930 ["*State Farm*'s proscription of dissimilar conduct to prove the amount of a punitive damages award also applies to evidence offered to prove that the defendant is guilty of malice, fraud or oppression and is therefore subject to such an award"].) The trial court properly concluded that plaintiffs' evidence concerning the Rough and Ready Fire and San Bruno explosion was too dissimilar to raise a triable issue of material fact as to PG&E's conduct with respect to the Butte Fire. The trial court also properly concluded that the company's post-tort conduct failed to demonstrate that PG&E acted with malice.

" 'Where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury.' " (*Kolstad v. American Dental Association* (1999) 527 U.S. 526, 539.) Here, there is no evidence that PG&E acted maliciously in setting policies designed to minimize the risk of wildfire or engaging contractors to assist in the company's fire mitigation efforts. Accordingly, there are no triable issues as to whether PG&E is properly subject to punitive damages under section 3294, and PG&E is entitled to summary adjudication on that issue.

## III.  DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate its decision denying the motion for summary adjudication of petitioners Pacific Gas and Electric Company and PG&E Corporation, and to enter a new order granting summary adjudication in favor of those parties.

The parties shall bear their own costs in this writ proceeding.  (Cal. Rules of Court, rule 8.493(a)(1)(B).)


/S/

RENNER, J.


We concur:

/S/

MAURO, Acting P. J.


/S/

MURRAY, J.


33